IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNTIED STATES OF AMERICA** : | |
| : | |
| v. : | |
| : | |
| **LEE OTIS HUDSON** : | **CRIMINAL NO. 07-082 (ESH)** |
| : | |
| : | |
| **Defendant.** : | |

UNITED STATES' OPPOSITION TO
DEFENDANT MOTION TO SUPPRESS EVIDENCE AND STATEMENT

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the Defendant's Motion to Suppress Evidence. In support of its Opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing.

Background

The defendant was charged, in a one count Indictment filed on March 22, 2007, with Unlawful Possession with Intent to Distribute 50 Grams or More of Cocaine Base, in violation Title 21, United States Code, Sections 841 (a)(1) and 841 (b)(1)(A)(ii).

At a hearing or trial in this matter, government counsel expects the evidence to demonstrate that on about March 8, 2007 (late night 3/7 into 3/8), members of the Metropolitan Police Department (MPD) set up a safety compliance checkpoint at the intersection of 17th and D Streets, Northeast in the District of Columbia, as a result of speeding traffic and unsafe driving throughout that neighborhood. The check point consisted of several marked cruisers with their overhead lights activated and manned by several officers in uniform. Every vehicle that came to the checkpoint was briefly stopped. When stopped, the driver was asked for a driver's permit

and vehicle registration. After showing the requested documentation, the driver was permitted to proceed. The evidence will show that most vehicles proceeded with no problems having been able to show requested credentials, or having been shown to have been bestowed with the credentials but merely not in possession of the documents by a WALES check by the officer.

The purpose of the checkpoint was to prevent motorists from driving unsafely, in particular, to address the speeding problem in the area. The check point was fixed. Officers were not looking into vehicles for anything. On several occasions drivers were observed either turning around or onto a street prior to the check point to avoid the check point. When this happened, officers did nothing but continued to man the fixed check point.

At about 0045 hours, the defendant decided to drive to the check point in a green van. As were all other vehicles, his was stopped. As the driver of the vehicle, the defendant was asked for his driver's permit and vehicle registration. The defendant told the Officer Nesmith that he had no driver's permit. Officer Nesmith clarified the defendant's response by stating do you have one but merely do not have it on your person, or do you not own a permit. The defendant told the officer that he did not own a driver's permit.

The defendant was told to get out of his vehicle for the purpose of being placed under arrest for driving without a permit. As the defendant exited the vehicle, Officer Nesmith observed a plastic bag in the defendant's waste area. Search incident to arrest revealed a plastic bag in the defendant's waste area containing large chunks of white rock like substance that measured about 90 grams and five clear small zip lock bags. The substance field tested positive to be crack cocaine. The defendant was transported to the police station where Officer Zurowski processed him. During processing, the defendant voluntarily gave a plastic bag containing 100

small zip lock bags to Officer Zurowski and stated, "can you get rid of these since I give em' to you."

The defendant now moves this Court to suppress the evidence (the crack cocaine, the 100 zip lock bags, and his statement) that was obtained by police after he was detained at the safety compliance checkpoint arguing that any statements he made, and any physical evidence found in his possession, after he was detained by officers of the MPD at an automobile checkpoint stop, should be inadmissible because the checkpoint detention constituted an unreasonable seizure, in violation of his Fourth Amendment rights. The defendant's motion is without merit and should be denied.

## Argument

**A.    The safety compliance checkpoint was constitutional**

Under Fourth Amendment jurisprudence, a person is "seized" as a matter of law when his vehicle is detained by police at a checkpoint stop. See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990). Such a seizure is constitutionally permissible, however, provided it is "reasonable." See U.S. Const. amend. IV ("The right of the people to be secure . . . , against unreasonable searches and seizures, shall not be violated . . . .") (emphasis added); see also United States v. McFayden, 865 F.2d 1306, 1310 (D.C. Cir. 1989).

To determine whether the seizure of an individual is reasonable, the Court must balance "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Brown v. Texas, 443 U.S. 47, 50- 51 (1979). Specifically, this Court has explained that, in order for an automobile checkpoint stop to pass constitutional scrutiny, (1) "there must be a legitimate state

interest at stake," (2) "the checkpoints must serve to promote the state interest in a 'sufficiently productive' fashion," (3) "the checkpoints must be minimally intrusive," and (4) the checkpoint must not serve as a "subterfuge" for detecting crimes unrelated to the stated purpose of the checkpoint. McFayden, 865 F.2d at 1311-12 (citing Delaware v. Prouse, 440 U.S. 648, 658-63 (1979)).

In Indianapolis v. Edmond, 121 S. Ct. 447 (2000), the Supreme Court further clarified under what circumstances a checkpoint stop will be deemed reasonable. The Court explained that, as part of its Fourth Amendment analysis, it would consider the "primary purpose" of the checkpoint. See Edmond, 121 S. Ct. at 453. Where the primary purpose of the checkpoint is, for example, "policing the border" or "ensuring roadway safety," or where exigent circumstances justify the checkpoint, the brief, suspicionless seizure of motorists may be reasonable under the Fourth Amendment. See id. at 452- 55 (discussing Michigan v. Sitz, 496 U.S. 444 (1990), Delaware v. Prouse, 440 U.S. 648 (1979), and United States v. Martinez-Fuerte, 428 U.S. 543 (1976)). Where, however, "law enforcement authorities pursue primarily general crime control purposes at checkpoints . . . , stops can only be justified by some quantum of individualized suspicion." Id. at 457.

In holding that checkpoint stops cannot have as their primary purpose general crime control, the Edmond Court expressly declined to "alter the constitutional status of the sobriety and border checkpoints that [the Court] approved in Sitz and Martinez-Fuerte, or of the type of traffic checkpoint that [the Court] suggested would be lawful in Prouse." Edmond, 121 S. Ct. at 457. Indeed, the Court noted that "[t]he constitutionality of such checkpoint programs still depends on a balancing of the competing interests at stake and the effectiveness of the program."

Id. Moreover, the Court added that its holding did "not impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose." Id.

**B.     The seizure of defendant did not violate the Fourth Amendment**

Defendant argues that the checkpoint stop at which he was detained was unconstitutional under the reasoning of Edmond. His arguments is incorrect, however, because the primary purpose of the checkpoint here is consistent with what the Edmond Court considered to be permissible under the Fourth Amendment, and, furthermore, the seizure of defendant at the checkpoint was reasonable.

**1.     The primary purpose of the checkpoint stop was consistent with the Fourth Amendment**

Under Edmond, it is the purpose of the checkpoint stop in general, and not the detention of any motorist in particular, that determines whether the checkpoint violates the Fourth Amendment. See Edmond, 121 S. Ct. at 456-57. The checkpoint in Edmond was held to be unconstitutional because its primary purpose was "the interdiction of narcotics." Id. at 453-54. The Court stated that it had "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." Id. at 454. Because the primary purpose of the checkpoint was "ultimately indistinguishable from the general interest in crime control," the Court held that the suspicionless seizure of motorists at the checkpoint violated the Fourth Amendment. Id. at 458.

The Court in Edmond did not hold, however, that all checkpoint stops are unconstitutional simply because they effectuate suspicionless seizures of motorists. To the contrary, the Edmond Court expressly recognized the constitutionality of checkpoint stops whose primary purpose was to "intercept illegal aliens," "remove drunk drivers from the road," or "verify[] drivers' licenses and vehicle registrations." Edmond, 121 S. Ct. at 452 (discussing Martinez-Fuerte, Sitz, and Prouse, respectively). The seizure of motorists at such checkpoints is constitutionally permissible because the checkpoints "serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety." Edmond, 121 S. Ct. at 454.

Unlike in Edmond, the primary purpose of the checkpoint stop at which defendant was detained was not to detect ordinary criminal wrongdoing. To the contrary, the primary purpose of the checkpoint was to ensure roadway safety and, specifically, to curb the problem of speeding motorists who were driving dangerously in a residential area. This purpose is not meaningfully distinguishable from the purpose of the sobriety checkpoint held to be constitutional in Sitz, or from the purpose of the "roadblock-type stops" that the Prouse Court suggested as a constitutionally permissible alternative to discretionary stops of motorists. See Sitz, 496 U.S. at 455; Prouse, 440 U.S. at 663. Because the primary purpose of the checkpoint at which defendant was detained was consistent with the "roadway safety" purpose recognized as permissible in Edmond, Sitz, and Prouse, the checkpoint does not suffer from the same constitutional infirmity as the checkpoint at issue in Edmond.

**2. The seizure of defendant was reasonable and search incident to arrest was lawful**

As the <u>Edmond</u> Court noted, the constitutionality of checkpoint stops that have a permissible primary purpose "still depends on a balancing of the competing interests at stake and the effectiveness of the program." <u>Edmond</u>, 121 S. Ct. at 457.  In this case, the seizure of defendant was reasonable under the Fourth Amendment because:  (1) the City had a legitimate interest at stake; (2) the checkpoint sufficiently promoted the interest; (3) the checkpoint was minimally intrusive; and (4) the checkpoint was not a subterfuge for detecting crimes unrelated to traffic violations.  See <u>United States v. McFayden</u>, 865 F.2d 1306, 1311-12.

The government expects Sergeant Evans to testify at a hearing that the instant checkpoint was set up to deter speeding motorists.  The Supreme Court has held that the government has a legitimate interest in promoting this kind of roadway safety.  Cf. <u>Sitz</u>, 496 U.S. at 451 ("No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."); <u>Prouse</u>, 440 U.S. at 658 ("We agree that the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed.").

Moreover, the evidence will demonstrated that the checkpoint was sufficiently productive in serving the City's interest in promoting safe driving.  The government expects the record to indicate that there is a reduction in speeding and other traffic violations as a result of a checkpoint, and that a number of arrests occurred that evening rendering the checkpoint sufficiently productive.  Cf. <u>Sitz</u>, 496 U.S. at 454-55 (two of 126 motorists, or 1.6 percent, arrested for alcohol impairment at sobriety checkpoint); <u>Martinez-Fuerte</u>, 428 U.S. at 554

(17,000 illegal aliens apprehended at border checkpoint through which ten million cars passed); McFayden, 865 F.2d at 1313 (2.5 percent of motorists arrested for traffic offenses).

The Supreme Court has recognized, motorists who drive without valid licenses and registration are more likely to create a danger to the community. See Prouse, 440 U.S. at 658 ("Automobile licenses are issued periodically to evidence that drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle. The registration requirement . . . [is] designed to keep dangerous automobiles off the road. Unquestionably, these provisions, properly administered, are essential elements in a highway safety program.").

The question of whether the checkpoint was minimally intrusive revolves around whether it: (1) was clearly visible; (2) was part of a systematic procedure that strictly limited the discretion of the individual officers; and (3) involved only a brief detention of motorists. See McFayden, 865 F.2d at 1312. In this case, all three prongs of the test were met. First, the checkpoint was clearly visible. The police were in marked cruisers with overhead lights activated along the street at the checkpoint. Officers were in uniform. Second, the police stopped every car that passed through the checkpoint from either direction, so there was no discretion exercised by the individual officers with regard to which vehicles would be stopped Finally, the stops were brief, and most motorists were permitted to proceed after they showed their license and registration.

Finally, the government expects the evidence to bear out that the checkpoint was not a subterfuge for detecting crimes unrelated to traffic violations, but rather a regulation of vehicular traffic; no intent to detect other kinds of crimes. Even if the checkpoint was part of a broader

8

police initiative, that does not mean it is a subterfuge. See McFayden, 865 F.2d at 1312 (rejecting argument that automobile checkpoint established as part of a broader drug enforcement initiative was a "subterfuge seizure technique for capturing drug dealers"). In any event, the instant checkpoint was not a part of a broader initiative; not a subterfuge to detect other crimes. Nor is the fact that the checkpoint stop resulted in arrests for non-traffic crimes evidence of subterfuge. Thus, it is not surprising, and should not be taken as evidence of subterfuge, that a checkpoint set up to alleviate traffic problems might result in arrests for offenses involving drugs. See McFayden, 865 F.2d at 1312 ("The fact that there may have been a 'halo' or 'spin-off' effect of deterring drug sellers and buyers from trafficking in areas where a roadblock was posted did not make an otherwise legitimate checkpoint unlawful.").

    Because the instant checkpoint involved a legitimate D.C. interest, which was sufficiently promoted by the checkpoint, and because the checkpoint was minimally intrusive and not a subterfuge for detecting non-traffic crimes, the seizure of defendant at the checkpoint was reasonable under the Fourth Amendment.[1] It therefore follows that the fruits of the lawful arrest

---

[1] Roadblocks. Random stops of cars for purposes such as checking license and registration may not be conducted by roving patrols. Delaware v. Prouse, 440 U.S. 648 (1979). Such stops at a fixed checkpoint can be permissible if they serve a legitimate state interest related to the regulation of traffic and are not a pretext for detecting crimes unrelated to the asserted interest. Indianapolis v. Edmond, 531 U.S. 32 (2000) (checkpoint set up to interdict narcotics violated Fourth Amendment); Michigan v. Sitz, 496 U.S. 444 (1990) (upholding highway sobriety checkpoints); United States v. Davis, 270 F.3d 977 (D.C. Cir. 2001) (roadblock could have primary purpose related to traffic enforcement and secondary purpose of interdicting narcotics; remanded for findings); United States v. McFayden, 865 F.2d 1306 (D.C. Cir. 1989) (upholding license, registration, and sobriety checks in high-drug areas); Galberth v. United States, 590 A.2d 990 (D.C. 1991) (striking down roadblocks found to be motivated by desire to deter drug trafficking or purported desire to decrease traffic congestion; similar roadblocks would be permissible if intended to check license and registration). See also Duncan v. United States, 629 A.2d 1 (D.C. 1993); Taylor v. United States, 595 A.2d 1007 (D.C. 1991). In Illinois v. Lidster, 540 U.S. 419 (2004), the Supreme Court upheld a roadblock whose primary purpose was

of the defendant who was driving without a permit, in violation of D.C. law, should not be suppressed.

**C.    The defendant's blurted statement "can you get rid of these since I give em' to you" is not subject to Miranda**

If a suspect is in custody, but volunteers a statement in the absence of interrogation, there is no Miranda e.g., Miranda v. Arizona, 384 U.S. 436, 478 (1966); Rhode Island v. Innis, 446 U.S. 291, 300 (1980).  During processing, the defendant voluntarily gave a zip lock bag containing 100 small zip lock bags to Officer Zurowski and stated "can you get rid of these since I give em' to you."  This statement was not the product of custodial interrogation and therefore should be admitted.  Moreover, the 100 zip lock bags (that would have been discovered in a subsequent search incident to a lawful arrest anyway) were voluntarily handed over to the police and should not be suppressed.

---

to seek information about a hit and run that had occurred at that location.

WHEREFORE all of the forgoing reasons, the government respectfully request that this Court deny the defendants motion to suppress the stop, search and seizure of the defendant and the drugs, drug paraphernalia, and statement.

                                      Respectfully submitted,

                                      JEFFREY A. TAYLOR
                                      United States Attorney
                                      Bar No. 498610

By:        /s/_____
       Angela Hart-Edwards
       Assistant United States Attorney
       PA Bar #61468
       U.S. Attorney's Office
       555 4th Street, N.W., Rm. 44241
       Washington, D.C. 20530
       (202) 307-0031

## Certificate of Service

I hereby certify that a copy of the United States' Opposition To Defendant's Motion To Suppress was served electronically upon counsel of record for defendant this 11th day of May, 2007.

_____
Angela Hart-Edwards
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNTIED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| LEE OTIS HUDSON | : | CRIMINAL NO. 07-082 (ESH) |
| | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

This matter is before the Court to suppress evidence and statement by defendant. The Court, having considered the Defendants Motions to Suppress Evidence and Statement, and the Government's Opposition thereto, and evidence put on at a hearing this _____ day of May, 2007, it is hereby

ORDERED, that the Defendant' Motion to Suppress Evidence and Statement shall be denied.

_____
U.S. District Court Judge E. S. Huvelle