IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Cr. No. 07-82 (ESH) |
| v. ) | |
| ) | |
| LEE HUDSON ) | |
| ) | |

**SUPPLEMENTAL MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS TANGIBLE EVIDENCE**

Mr. Lee Hudson, the defendant, through undersigned counsel, respectfully submits the following as additional support for his motion to suppress evidence.

**Factual Background**

Mr. Hudson is charged in a one count indictment with unlawful possession with intent to distribute 50 grams or more of cocaine base. The charge arose out of an incident that occurred on March 8, 2007.

On May 5, 2007, Mr. Hudson, through counsel, filed a motion to suppress the tangible evidence and statements recovered on March 8th, because they were the fruit of violations of Mr. Hudson's Fourth Amendment rights. On May 16, 2007, the Court held an evidentiary hearing on the motion. At the hearing, the government called three witnesses, Timothy Evans, Terrance Nesmith, and Thomas Zurowski, all of whom are officers with the Metropolitan Police Department (hereinafter "MPD"). Tr. 7, 48, 70.[1]

---

[1] All transcript references are to the transcript of the motions hearing held before this Court on May 16, 2007.

## Testimony of Officer Evans

Officer Evans testified that he has been a sergeant with the MPD for approximately five years, and he is the supervisor for the Street Crime/Power Shift Unit of the First District. Tr. 7, 8. His unit conducts, on average, one safety compliance check per week. Tr. 25. It is within his discretion to decide when to set up a checkpoint, Tr. 26, and it is also within his discretion to determine where the checkpoint will be.[2] Tr. 17-18, 25. Officer Evans testified that there are no documents that must be filled out in relation to setting up or executing a checkpoint.[3] Tr. 11. There are also no D.C. MPD regulations, guidelines, or orders on safety compliance checks that were in place on March 8, 2007.[4] Tr. 12, 43. Officer Evans had never seen any written policies governing safety compliance checks. Tr. 24. When Officer Evans determines there will be a checkpoint, he either tells his officers in roll call, or he tells them to report directly to the location of the checkpoint. Tr. 42-43. They do not receive any written orders with respect to the policies and procedures governing the checkpoint. Tr. 43.

On March 8, 2007, Officer Evans and his unit conducted a safety compliance checkpoint at 17th and D Street, N.E. Tr. 8. In the last two years, there have been ten checkpoints at that location. Tr. 10. Officer Evans is the one who decided to set up a checkpoint at 17th and D Street; no checkpoints at that location had been conducted prior to his promotion to sergeant in

---

[2] Officer Evans testified that he will sometimes discuss the location of the checkpoint with his partner, but that "in this case . . . this was my decision." Tr. 25.

[3] "The only thing I do is a 24-hour report at the end of the night, and that's for the commander. That pertains to everything, not just the checkpoint, all arrests we have." Tr. 11.

[4] Officer Evans testified that there is a district order that recently issued but it is currently not finished and was not in place on March 8, 2007. Tr. 12.

2002.  Tr. 44-45.  He testified that his reason for setting up a checkpoint at this particular location was to prevent speeding.  Tr. 10, 18, 28.  He felt that speeding was a problem due to the radar devices set up in that area and from his experience monitoring traffic there.  Tr. 18.

There were 10-15 uniformed officers and four police vehicles set up at the checkpoint on March 7, 2007.  Tr. 11.  As drivers approached the checkpoint, there were no signs, no additional lights other than those coming from the police car, and no flares.  Tr. 34-35.  All cars that passed through the checkpoint were stopped.  The officer would explain the reason for the stop, check for license and registration, and, if everything checked out, the stop would last about a minute.  Tr. 15.  If the person did not have a license or registration, the car would be pulled over so the officers could conduct further investigation.  Tr. 15.  If the person in fact did not possess a license, he or she would be arrested.  Tr. 34.  According to Officer Evans's recollection, approximately 50-60 cars came through the checkpoint that evening, and there were a total of five arrests.  Tr. 14.  There is no written documentation of these facts.  Tr. 31-32.  Aside from Mr. Hudson, three people were cited for possession of an open container of alcohol in a vehicle and, one was cited for no permit.  Tr. 33.  The first time Officer Evans saw Mr. Hudson, he was already under arrest, and his car was pulled over to the side in an alley that was north of the police cars, before the actual checkpoint.  Tr. 42.  Officer Evans does not know if Mr. Hudson's vehicle ever made it to the checkpoint.  Tr. 42.  Other than the instant offense, Mr. Hudson was cited only for not having a permit.  Tr. 42.

### Testimony of Officer Nesmith

Officer Nesmith has been employed at the MPD for just over two years.  Tr. 58.  In that time, he has conducted six checkpoints, two of which were at 17th and D street.  Tr. 58.  On

March 7, 2007, Officer Evans told Officer Nesmith to report to 17th and D street for a safety compliance check. Tr. 48, 60. Officer Nesmith did not attend a briefing session with respect to this checkpoint. Tr. 60-61. He explained his understanding of safety compliance checks as follows: "Well, we didn't have a briefing that day, I don't think, I didn't go to no briefing, but it was just a known thing that when we do safety compliance checkpoints, we look for license, registration, insurance, and any obvious safety violations on the vehicle." Tr. 61. He never attended any formal meetings instructing him how to conduct a safety compliance check. Tr. 61. He testified that in roll call, "they may mention what we're looking for when we go to these safety compliance checkpoints," but not always. Tr. 61.

    On the evening of Mr. Hudson's arrest, Officer Nesmith parked his car a few feet away from the checkpoint and walked beyond the beginning of the checkpoint to Mr. Hudson's car, which was "the next car that wasn't stopped." Tr. 50. He told Mr. Hudson that this was a safety compliance checkpoint and asked for his license, registration, and insurance. Tr. 50. Mr. Hudson told him he did not have a license, and Officer Nesmith asked if he did not possess one or if he left it at home, to which Mr. Hudson responded that he did not possess one. Tr. 50. Officer Nesmith had another officer, Vickie Steen, run a WALES check on Mr. Hudson and asked Mr. Hudson to step out of the car. Tr. 50. When Officer Steen confirmed that Mr. Hudson did not have a license, Officer Nesmith placed him in handcuffs. Tr. 51, 52. Officer Nesmith searched Mr. Hudson and recovered a plastic bag of narcotics behind his belt. Tr. 52. Mr. Hudson then made the following statements: "Who put that there;" "Who do I make a deal with;" "I could really get y'all something;" and "You all are not the people I make a deal with. I make a deal with the DA." Tr. 66-67. These statements were made before any <u>Miranda</u> warnings were

given. Tr. 68. Officer Nesmith then handed Mr. Hudson off to Officer Zurowski. Tr. 57.

### Testimony of Officer Zurowski

Officer Zurowski has been at the MPD for five years. Tr. 70. Prior to this date, Officer Zurowski had worked at the checkpoint on 17th and D once or twice before. Tr. 78. He has never been instructed as to what to look for at a checkpoint. Tr. 78. His understanding as to the reason for the checkpoint at 17th and D street is because the cars speed around the corner. Tr. 78-79. He does not know of any accidents that occurred in that area. Tr. 79.

On March 7, 2007, Officer Zurowski reported directly to the safety compliance checkpoint. Tr. 74. He did not see Mr. Hudson's car pull up to the checkpoint; the first time he saw Mr. Hudson was when he was already in handcuffs. Tr. 74-75. Officer Zurowski transported Mr. Hudson from the checkpoint to the police station. Tr. 75. Once at the police station, Officer Zurowski went to let Mr. Hudson out of the vehicle. After he opened the doors but before he got Mr. Hudson out of the vehicle, Mr. Hudson handed Officer Zurowski a bag full of ziplock bags and stated "Can you get rid of these since I give 'em to you." Tr. 71, 77. When this occurred, Officer Zurowski was in uniform and he was armed. Tr. 76. Mr. Hudson had not been advised of his Miranda rights at this point.

### Argument

**I. The Checkpoint Constituted an Illegal Seizure Under the Fourth Amendment**

The Fourth Amendment provides, in relevant part:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .

U.S. CONST. amend. IV. The Supreme Court has established that stopping a car at a

vehicle checkpoint constitutes a seizure within the Fourth Amendment. Indianapolis v. Edmond, 531 U.S. 32, 40 (2000). In order to determine if a vehicle checkpoint complies with the reasonableness requirement of the Constitution, courts must balance the extent to which the seizure infringes upon personal liberty against its advancement of government interests. Delaware v. Prouse, 440 U.S. 648, 654 (1979) ("the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interest against its promotion of legitimate government interests"); See also United States v. McFayden, 865 F.2d 1306, 1311-12 (D.C. Cir. 1989) (using a four factor balancing test to determine reasonableness of checkpoints: 1) there must be a legitimate interest at stake; 2) it must promote the state interest in a "sufficiently productive" fashion; 3) it must be minimally intrusive; 4) it cannot be a pretext for detecting other crimes). In this case, the interests served by the checkpoint do not outweigh its intrusion on Mr. Hudson's personal liberty, and the seizure was therefore unreasonable.

    **A.    The Checkpoint Was Not Sufficiently Productive in Promoting A Legitimate Government Interest**

In all of the very limited situations in which the Supreme Court has suspended the individualized suspicion requirement to allow vehicle checkpoints, there has been a particular interest for which the use of a checkpoint has been specifically required. In United States v. Martinez-Fuerte, 428 U.S. 543, 546-557 (1976), the Court upheld immigration checkpoints at the Mexican border where the checkpoints were extremely narrowly tailored to address the well-documented government interest in curbing illegal

immigration. The checkpoints were placed in locations carefully chosen because they were "at or near intersections of important roads leading away from the border." Id. at 552. The effectiveness of the locations were documented, with 17,000 illegal immigrants apprehended at one checkpoint over the course of one year. Id. at 554. When cars went through the checkpoint, the border patrol simply looked inside the vehicle for possible illegal aliens. No questions were asked and no papers were requested unless, based on what the officers saw, there was reason for further inquiry. Id. at 546. In addition, the Court noted that a method of detecting illegal aliens based on reasonable suspicion would be impractical given the heavy flow of traffic that passed through. Id. at 557. This checkpoint had a specific purpose, and it was set up to address that purpose alone. In addition, there was no other less intrusive means by which to accomplish the goal.

    In Michigan Dept. Of State Police v. Sitz, 496 U.S. 444, 447-55 (1990), the Supreme Court upheld a highway sobriety checkpoint program. The program was the result of collaboration by police, government officials, and scientists who formed a committee and created guidelines and policies beforehand to govern the checkpoints. In upholding the checkpoint, the Court emphasized the grave and well documented dangers posed by drunk driving (25,000 deaths per year), the empirical results (1.6% of drivers passing through the checkpoint were arrested for drunk driving), and the very minimal intrusion (average stop was 25 seconds, no license or registration was requested unless officers suspected intoxication). This is another example of a checkpoint that was extremely narrowly tailored to address only the stated interest, and it did so in a regulated,

documented manner.

Unlike the checkpoints in Martinez-Fuerte and Sitz, the checkpoint set up by the MPD on March 7, 2007, was not tailored to address the stated government interest at stake. In assessing the reasonableness of a checkpoint, courts must first determine the primary purpose of the checkpoint. Indianapolis v. Edmond, 531 U.S. 32, 41-42 (2000). During the motions hearing, Officer Evans, who chose the location of the checkpoint, testified that the primary purpose of this checkpoint was to address speeding:[5]

> DEFENSE COUNSEL: But specifically, you indicated that the primary purpose of [this checkpoint] was to prevent speeding.
>
> OFFICER EVANS: Well, it is. It is. Yes, ma'am. In that situation, in this location, yes ma'am.

Tr. 28. See also Gov't Opp'n to Def. Mot. To Suppress at 2 ("The purpose of the checkpoint was to prevent motorists from driving unsafely, in particular, to address the speeding problem in the area").

While speeding is, generally speaking, a legitimate government interest, it is not one that can or should be addressed by a checkpoint. Applying common sense for a moment, it is obvious that it would be impossible for a checkpoint to address the speeding problem, because when an individual is stopped, his vehicle is no longer moving. There are a number of ways to address speeding that are both more effective and less intrusive: radars, signs by the road showing the driver his speed and the speed limit,

---

[5] That the officers also checked for drivers licenses and registration here is irrelevant, for as the Court in Edmond held, it must "examine the available evidence to determine the primary purpose of the checkpoint program" or else law enforcement officers "would be able to establish checkpoints for virtually any purpose so long as they also included a license and sobriety test." Edmond at 457.

and, most importantly, police officers who are trained to recognize speeding vehicles and pull people over and issue citations. See Prouse, 440 U.S. at 659 ("The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations"). When, as is the case here, a checkpoint does not sufficiently address a particular government interest, the checkpoint is an unreasonable intrusion on individual freedom. See, e.g., State v. Henderson, 114 Idaho 293, 297 (1988) (sobriety checkpoint unconstitutional because police testified that roadblocks are less efficient than normal stops based on probable cause); State v. Koppel, 127 N.H. 286, 292 (1985) (sobriety checkpoint unconstitutional where there may be lesser intrusive means to achieve goal); Higbie v. State, 780 S.W.2d 228, 238 (Tex.Crim.App. 1989) (finding a roadblock is not the only effective means–officers could patrol roads suspected of being traveled upon by intoxicated drivers as they are trained to look for "outwardly visible articulable facts" of driving while intoxicated). The use of checkpoints is to be reserved to address specific problems that can be best dealt with by stopping vehicles and making additional observations. This was true with the border patrol stops, and it was true with the sobriety checkpoints. It is not true for stops set up to prevent speeding, and it is not true in this case.

  Because it is impossible to cite someone for speeding when his or her car is not moving, using speeding as a basis for a checkpoint invites--indeed requires--the conclusion that it is only a pretext for discovering other violations. Use of roadblocks as a subterfuge for detecting crimes unrelated to their primary purpose is unlawful. See United States v. McFayden, 865 F.2d 1306, 1312 (D.C. Cir. 1989). During the course of

the checkpoint in this case, three people were cited for possession of an open container of alcohol and one for no permit. Tr. 33. This is in addition to Mr. Hudson's citation for possession of narcotics. It is true that when a legitimate checkpoint is in place, police are not required to ignore evidence of other crimes. United States v. Lopez, 777 F.2d 543, 547 (10th Cir. 1985). However, because there was no legitimate purpose for the checkpoint to begin with in this case, the police were given what amounted to a blank check to stop vehicles and detect other crimes–ANY crimes. This unstructured intrusion on individual liberty cannot be justified.

      **B.**      **The Checkpoint Greatly Intruded on Mr. Hudson's Individual Rights**

The way in which this checkpoint was set up inflicted substantial and unnecessary intrusion on Mr. Hudson's Fourth Amendment rights. Even if speeding was a legitimate reason for setting up a checkpoint, there are no statistics, records, or other documentation that this particular location would benefit from having a speeding checkpoint.[6] See Brouhard v. Lee, 125 F.3d 656, 658 (8th Cir. 1997) (nine sites for sobriety checkpoints selected because of a history of alcohol-related accidents and DWI arrests); State v. Hicks, 55 S.W.3d 515 (Tenn. 2001) (finding a license checkpoint illegal where "no proof exists that the time and site of this roadblock were chosen because of their effectiveness in detecting and deterring unlicensed drivers"); State v. Superior Court, 143 Ariz. 45, 48-49 (1984) (location of stops determined on basis of statistics and alcohol-related stops). Though Officer Evans testified that knows from personal experience that speeding is a

---

[6] In fact, there is a complete void of statistics, records, or documentation indicating that this location would be appropriate for ANY sort of checkpoint, including but not limited to speeding, license and registration checks or sobriety checks.

problem at the intersection of 17th and D street, he did not provide any statistics documenting the number of accidents or citations at that location, nor did he provide specific examples to corroborate his general knowledge.  Tr. 18.  Indeed, Officer Zurowski testified that he has patrolled that area for a year and a half and he never heard of or observed an accident there.  Tr. 79.  In order to minimize the intrusion on an individual's rights, the location of the checkpoints cannot be haphazard or whimsical.  There is no basis in the record, other than Officer Evans's personal feelings, for establishing the checkpoint at 17th and D street.  The resulting intrusion, therefore, was unjustified.

     Another way checkpoints are narrowly tailored to minimize their level of intrusiveness is through the use of regulations, guidelines, and policies that govern the locations, times, and procedures to be used at the checkpoints.  See e.g., United States v. Huguenin, 154 F.3d 547, 557 (6th Cir. 1998) (checkpoint was illegal where guidelines were not followed and were not adequate to begin with); Campbell v. State, 679 So.2d 1168, 1172 (Fla. 1996) (requiring written guidelines that limit police discretion in advance of setting up a roadblock); Com. v. Blouse, 531 Pa. 167, 173 (1992) (upholding a roadblock that was "conducted pursuant to written departmental policy"); Com. v. Amaral, 398 Mass. 98, 100-101 (1986) (roadblock unconstitutional where government failed to offer any evidence of guidelines, specifically, "carefully established standards and neutral criteria should determine the time and location of roadblocks and the procedures to be followed"); State v. Crom., 222 Neb. 273, 277 (1986) (transitory checkpoint illegal where "there was no plan formulated at the policymaking level" of the

police department, or elsewhere, that governed the checkpoint); State v. Superior Court, 143 Ariz. 45, 47 (1984) (roadblock upheld where all officers received written directives detailing what to say and how to react in certain situations; location chosen based on statistics of where highest number of collisions had occurred); State ex rel. Ekstrom v. Justice Court, 136 Ariz. 1, 5 (1983) (roadblocks unconstitutional where they "were operated without specific directions or guidelines").

The checkpoint here is utterly void of any of these mechanisms that aid to minimize the intrusiveness of the seizure. Officer Evans testified that there were no MPD regulations, guidelines, or orders in place governing checkpoints as of March 8, 2007. Tr. 12, 43. There are also no forms to fill out in order to set up a checkpoint, get approval for a checkpoint, or document the results of a checkpoint. Tr. 11. He himself has the sole discretion as to when to set up a checkpoint, and he can do it at any time. Tr. 17-18, 25-26. He does not need approval or input from any administrators, policymakers, or MPD officials. In addition, he does not conduct briefing to inform the other officers as to the procedures that must be followed or the purpose of the checkpoint. Tr. 43. Sometimes the officers report directly to the checkpoint and that is the first they know of it. Tr. 42-43. Officer Nesmith confirmed that he did not receive any briefing on the checkpoint that evening, and he apparently never went through any training to learn the procedures for the checkpoint. Tr. 60-61. Officer Zurowski had also never been instructed on how to conduct a checkpoint. Tr. 78. This checkpoint simply does not possess any of the characteristics of the carefully tailored checkpoints that courts have upheld in the past. There are absolutely no policies, guidelines, or orders from any administrative officials

detailing the purpose or procedures to be followed. There are no forms or records to be kept to track the progress of the checkpoint. There are no requirements as to where the checkpoint will be, when it will be, or how often. And there is no mechanism for instructing the officers exactly what they are to do so as not to infringe on the rights of the individuals who pass through. The lack of any sort of check on this operation highlight its glaring intrusiveness.

      Finally, the stop itself reflects the lack of planning of this checkpoint, its lack of notice to drivers, and its resulting large intrusion on the liberty of the individuals who pass through it. See State v. Superior Court, 143 Ariz. 45, 47 (1984) (checkpoint legal where press releases issued beforehand; existence of stops advertised on public radio; signs alerted drivers to purpose of stop before they had to stop); State v. Jones, 483 So.2d 433 (Fla.1986) ("procedures followed at a given roadblock are extremely important when determining the checkpoint's constitutionality. Police should provide both proper lighting and sufficient warning on the roadway in advance of the stop so as to reduce the threat of startling the driver"); State v. Leighton, 551 A.2d 116 (Me.1988) (roadblock upheld where procedures were in accordance with guidelines established in advance; officers used flashing lights, orange cones, flares, and reflective clothing to identify the stop and the approaching officers); Webb v. State, 739 S.W.2d 802, 810 (Tex.Crim.App.1987) (roadblock unreasonable where it was not publicized beforehand, not properly illuminated, and no formal, neutral guidelines effected beforehand). At the checkpoint where Mr. Hudson was seized, there were no lights other than the lights from the police cars, to alert drivers to the checkpoint. There were no signs, no flares, no cones, and no

reflective gear was worn by the officers. Tr. 34-35. This lack of notice or warning resulted in considerable intrusion.

      **C.    On Balance, The Checkpoint Was Illegal Because The Government Interest Was Minimal and the Individual Intrusion Was Great**

The government interest at stake here was speeding. Though this is a legitimate government interest in general, it is not one that can be adequately addressed by a checkpoint, for the obvious reason that when a car is stopped, it is not speeding. There are many other means by which officer can detect and deter speeding that are far less intrusive and far more effective. The government interest here, therefore, was minimal.

On the other hand, the intrusion of individual liberty inflicted by the checkpoint was substantial. Possibly the most troubling manifestation of the intrusion is the complete and utter lack of any guidelines, policies, orders, or directives detailing how, when, where, or why to conduct this checkpoint. There was absolutely zero accountability, as no permission or approval was necessary in order to set up a checkpoint, and no forms needed to be filled out to document the results. Furthermore, the location of the checkpoint was not based on any research, statistics, or consensus among administrative officials. It was up to one man alone, and it was based on his personal views of where to have a checkpoint. The officers conducting the checkpoint received no training or written instructions; often they did not even know they were operating a checkpoint until they showed up to work. And the manner in which this checkpoint was conducted, the lack of signs, flares, lights, or reflective gear, showcased its haphazard nature. None of the mechanisms ensuring minimal intrusiveness that so

many courts have recommended or required were present at this checkpoint.

Because the checkpoint's intrusiveness far outweighs the government interest at stake, it constituted an unreasonable seizure, and all evidence recovered as a result of this seizure must be suppressed.

## II. Mr. Hudson's Statements were Involuntary and Made in Violation of <u>Miranda</u>

With respect to the statements made by Mr. Hudson in response to Officer Nesmith, Tr. 66-67, the government has indicated that it does not intend to use any of these during trial. Indeed, defense counsel submitted a discovery letter requesting all statements made by Mr. Hudson and was not apprised of any of the statements relayed by Officer Nesmith at the motions hearing. There is no mention of these statements anywhere in the police reports. Government counsel indicated that the first time she learned of these statements was when Officer Nesmith was testifying on the stand at the motions hearing. For these reasons and the reasons submitted in defendant's motion to suppress, defense counsel submits that these statements should not be permitted at trial.

With respect to the statement made in response to Officer Zurowski, Tr. 71, 77, Mr. Hudson respectfully submits the issue for consideration based upon the arguments set forth in his original motion to suppress.

**Conclusion**

For the foregoing reasons, and any other reasons that the Court may deem just and reasonable, Mr. Hudson requests that the Court suppress the physical evidence recovered during the search and all statements made by Mr. Hudson on March 8, 2007, along with any other evidence or statements obtained by the officers in violation of the Fourth and Fifth Amendments.

Respectfully submitted,

A. J. KRAMER
Federal Public Defender


_____/"s"/_____
RITA BOSWORTH
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, DC 20004
(202) 208-7500