IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNTIED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | |
| LEE OTIS HUDSON : | CRIMINAL NO. 07-082 (ESH) |
| : | |
| : | |
| Defendant. : | |

**UNITED STATES' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental memorandum in support of its opposition to defendant's motion to suppress evidence and in response to defendant's supplemental memorandum in support of its motion to suppress evidence and statements.

**I.      Procedural and Factual Background**

The defendant was charged in a one count Indictment filed on March 22, 2007, with Unlawful Possession with Intent to Distribute 50 Grams or More of Cocaine Base, in violation Title 21, United States Code, Sections 841 (a)(1) and 841 (b)(1)(A)(ii).

On May 5, 2007, the defendant filed a motion to suppress statements[1] and evidence[2] recovered on March 8, 2007, at a safety compliance checkpoint at the intersection of 17th and D Streets, NE in D.C., in a search incident to the arrest of the defendant for operating a vehicle without a permit. The defendant contends that his Fourth Amendment rights were violated because the safety compliance checkpoint was unconstitutional.

---

[1] "can you get rid of these since I give em [100 zip lock bags] to you"

[2] 90 grams of cocaine base and 105 small plastic zip lock bags

On May 11, 2007, the United States opposed the defendant's motion to suppress evidence asserting the safety compliance checkpoint passed constitutional scrutiny, applying the balancing test set forth in Brown v. Texas, 443 U.S. 47, 50-51 (1979), further explained in United States v. McFayden, 865 F.2d 1306 (D.C. Cir. 1989), and in Indianapolis v Edmond, 531 U.S. 32 (2000), rendering the checkpoint and fruits therefrom admissible.

On May 16, 2007, this Court held an evidentiary hearing on the motion. At the hearing, the government called three witnesses: Metropolitan Police Department (MPD) Sergeant (Sgt.) Timothy Evans who was in charge of the instant safety compliance checkpoint; Officer Terrance Nesmith who stopped and arrested the defendant, and in a search incident to arrest, recovered narcotics from the defendant's waist area; and Officer Thomas Zurowski to whom defendant made the spontaneous statement, "can you get rid of these since I give em to you" while giving 100 small zip lock bags to the officer.

The defendant now submits a supplemental memorandum of points and authorities in support of its motion to suppress tangible evidence and statements, relying on U.S. Supreme Court case and on several state court decisions that are not binding precedent for this federal jurisdiction, including cases that have been overturned and cases that are distinguishable from the instant case. Defendant motion to suppress remains without merit and should be denied.

Without restating every argument and re-citing every case, the government incorporates all points and authorities relied upon in its opposition to the defendant's motion to suppress evidence. The government also states the following to supplement its opposition to the defendant's motion to suppress evidence and in response to defendant's supplemental memorandum of points and authorities. A transcript of the hearing was completed and the

government will include testimonial evidence to support points in the Argument Section of this memorandum while referring to the transcript of the May 16 hearing as "Tr."

## II. Argument

### A. Defendant was seized under the Fourth Amendment

A review of the parties' memoranda in this case reveals that the parties agree that under Fourth Amendment jurisprudence, a person is "seized" as a matter of law when his vehicle is detained by police at a checkpoint stop. *Gov's May 11 Opp., p 3; Def.'s Supp. Memo., pp. 5-6.* The parties also agree that such a seizure is constitutionally permissible, however, provided it is "reasonable." See U.S. Const. amend. IV ("The right of the people to be secure . . . , against unreasonable searches and seizures, shall not be violated . . . .") (emphasis added); see also United States v. McFayden, 865 F.2d 1306, 1310 (D.C. Cir. 1989). *Gov's Opp. to Def's. Mo. to Suppress, pp. 3 - 5; Def's Supp. Memo, pp. 6 - 8.* The parties disagree on the constitutionality of the suspicionless seizure of the defendant at the instant checkpoint. As discussed here and in the government's opposition to defendant's motion to suppress evidence filed on May 11, 2007, the government will demonstrate that 17th and D Street, NE checkpoint passes constitutional scrutiny.

### B. The safety compliance checkpoint passes constitutional scrutiny

#### 1. The safety compliance checkpoint addressed the legitimate state interest of roadway safety

The United States Supreme Court has held in numerous decisions that checkpoints to ensure roadway safety including verification of qualified drivers would be permissible to serve a highway safety interest. *See Gov.'s Opp. to Defendant's Mo. to Suppress, pp. 4 - 6.*

The government's evidence was that the 17th and D Street checkpoint was set up to address roadway safety and compliance which included the most obvious and documented violation of safety measures taken by drivers of vehicles traveling the area; speeding. The checkpoint was set up to address not only speeding, as contended by the defendant, but also safety compliance. At the May 16 hearing, Sgt. Evans testified that he was the supervisor for the Street Crime/Power Shift Unit. "We were conducting a safety and compliance checkpoint at 17th and D Streets., NE." *Tr. 8:6-8.* "[T]he purpose of the checkpoint was basically traffic and safety. The initial reason why you set one up is traffic and safety, make sure people are knowledgeable, make sure people have the proper paperwork with their vehicle, insurance, all that type of thing, prevent fatalities in traffic, and so it's basically a safety thing." *Tr. 28:8-14.* In any event, the defense acknowledges that "speeding is a legitimate government interest." Def. Supp. Memo. at p. 8.

The Supreme Court has recognized, motorists who drive without valid licenses and registration are more likely to create a danger to the community. See Delaware v. Prouse, 440 U.S. 648, 658 (1990) ("Automobile licenses are issued periodically to evidence that drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle. The registration requirement . . . [is] designed to keep dangerous automobiles off the road. Unquestionably, these provisions, properly administered, are essential elements in a highway safety program.").

      **2.**      **The checkpoint served to promote the stated interest of "traffic and safety" in a sufficiently productive way**

The evidence has demonstrated that the checkpoint was sufficiently productive in serving the City's interest in ensuring roadway safety. Sgt. Evans testified that "there were a total of five arrests on March 8," *Tr. 14:9-13,* "about 20 warnings to folks to wear seatbelts so they are not ejected and fatally wounded in the event of a vehicle accident," *Tr. 21:13- 21*, "and a lot of other verbal warnings, and one citation issued for a tint violation, and two citations issued for driving with no permit," *Tr. 32:11 -22; 14: 18-21*. Sgt. Evens testified that "each time they conduct a check point at 17th and D Streets, they issued on average five citations, make on average five arrests, give a lot of verbal warnings,, and give a lot of warning tickets." *Tr. 32:6-22*. These events render the checkpoint sufficiently productive. Cf. Sitz, 496 U.S. at 454-55 (two of 126 motorists, or 1.6 percent, arrested for alcohol impairment at sobriety checkpoint); Martinez-Fuerte, 428 U.S. at 554 (17,000 illegal aliens apprehended at border checkpoint through which ten million cars passed); McFayden, 865 F.2d at 1313 (2.5 percent of motorists arrested for traffic offenses).

      **3.**      **The checkpoint was minimally intrusive**

The defendant argues that although speeding is a legitimate government interest, serving this interest through a checkpoint greatly intrudes on Mr. Hudson's individual rights. He asserts that the checkpoint is not minimally intrusive as required by the Supreme Court since there are a number of ways to address speeding that are both more effective and less intrusive such as, radars, speed limit signs, and having trained police officers pull speeding vehicles over and issue citations. The defendant's argument is flawed for several reasons.

First, the defendant relies on the following non-binding precedent to support his point that the checkpoint is intrusive. State v. Henderson, 114 Idaho 293 (1988) (State of Idaho Supreme Court held sobriety checkpoint unconstitutional). Reliance on this 1988 state court case in the face of a 1990 U.S. Supreme Court decision which specifically upheld sobriety checkpoints aimed at removing drunk drivers from the road should not be followed by this Court. *See* Michigan Dept of State Police v. Sitz, 496 U.S. 444 (1990).

The defendant also relies on Higbie v. State, 780 S.W. 2d 228 (Tex Crim. App. 1989) which held sobriety and license checkpoints to be unconstitutional, but was overruled by King v. State, 800 S.W. 2d 528 (Tex. Crim. App. Nov 14, 1990). State v. Koppel, 127 N.H. 286 (1985) is a New Hampshire state court decision finding sobriety checkpoint unconstitutional prior to U.S. Supreme Court's upholding sobriety checkpoints in Sitz.

Second, the question of whether the checkpoint was minimally intrusive revolves around whether it: (1) was clearly visible; (2) was part of a systematic procedure that strictly limited the discretion of the individual officers; and (3) involved only a brief detention of motorists. See McFayden, 865 F.2d at 1312. In this case, all three prongs of the test were met. First, the checkpoint was clearly visible.

Clearly visible. Sgt. Evans testified that the checkpoint consisted of four scout cars with the blue and red overhead lights activated in the street manned by 10 to 15 officers in uniform all in the street from which this Court can infer the officers were not hiding or conducting an undercover operation. *Tr. 13:11 - 21; 11:4-6.* Indeed, some drivers avoided the check point by turning onto a street right before the checkpoint and when that happened, the officers did nothing. Tr. 18-19:24-17. The public had notice of check points based on the fact that they are

6

conducted at the same location about once a month. Indeed, ten checkpoints had been set up at the same location in the past year and a half prior to March 8, 2007. *Tr. 14:4 - 7.*

<u>Systematic procedure</u>. The checkpoint was part of a systematic procedure that strictly limited the discretion of the individual officers. Sgt. Evans testified that "we try to set the checkpoints up especially at 17th and D Street because we have a big problem with the vehicles flying around the corner at 17th Street at a high rate of speed, which is really the reason why we set it up there is to slow some of the these vehicles down ... and to make people aware that police are in the area and that they must be safe." *Tr. 10: 6-12; 18:3 - 9.*

When set up, the checkpoint at 17th and D usually runs for about the same time of day for about two hours between 22:00 and 02:00 hours. *Tr. 25:13-18*. The selection of what day to conduct a checkpoint depends on the manpower available. *Tr. 25-26:19-3.* Officers who manned the checkpoint had no discretion in what vehicles to stop; all vehicles that approached or passed through the checkpoint were stopped, and all drivers were asked to see her driving permit and registration. *Tr. 9:20-23; 10:19-25; 11:4-6.* The stops were brief; lasted no more than a minute. *Tr. 15:3-4* Most motorists were permitted to proceed after they showed their license and registration. *Tr. 12-13: 24-2 and 15:3-4.*

Sgt. Evans testified further that he was in charge of setting the checkpoint up at 17th and D Streets, NE, based on his knowledge of traffic problems at the intersection of 17th and D Streets. The basis of his knowledge comes from documentation from the monitoring of traffic by the Lidar equipment (radar) set up at the location several times and personal observations of traffic in the area. *Tr. 18:15 - 22.* Sgt. Evans was also aware of several accidents that occurred at the location based on monitoring his radio when on duty. *Tr. 33:12 - 15.*

> 4. **The checkpoint was not a subterfuge for detecting crimes unrelated to the stated purpose of the checkpoint**

The evidence bore out that the checkpoint was not a subterfuge for detecting crimes unrelated to traffic violations, but rather a regulation of vehicular traffic. Sgt. Evans and the arresting officer Nesmith at *Tr. 48:13-17* testified that the primary purpose of this check point was roadway safety. Consistent with this testimony, all arrests, warnings, and citations related to traffic safety. In addition, all information relied upon in determining to set up the checkpoint related to roadway safety at 17th and D Streets, NE. Indeed, the defendant was arrested for driving without a permit and in a subsequent search incident to arrest, narcotics was found on his person. The instant checkpoint was not a part of a broader initiative; not a subterfuge to detect other crimes. *Tr. 9:15-22; 16:6-20.* Officers are not required to ignore obvious implements of non-traffic crimes because they are manning a safety checkpoint. See United States v. Rone, 2006 WL 1687780 (2006) (traffic checkpoint lead to an arrest for possession of firearms). Thus, it is not surprising, and should not be taken as evidence of subterfuge, that a checkpoint set up to alleviate traffic problems might result in arrests for offenses involving drugs. See McFayden, 865 F.2d at 1312 ("The fact that there may have been a 'halo' or 'spin-off' effect of deterring drug sellers and buyers from trafficking in areas where a roadblock was posted did not make an otherwise legitimate checkpoint unlawful.").

> 5. **The primary purpose of the checkpoint was consistent with the Fourth Amendment**

The government incorporates its specific discussion of this point in its opposition to defendant's motion to suppress evidence and statements at pages 5 - 6 and states the following. Sgt. Evans testified that the safety compliance checkpoint was set up in response to

specific problems documented at 17th and D Streets. Specifically, he testified that speed was monitored by radar, use of Lidar equipment, but there was no deterrent effect which is why ten checkpoints had been set up at this same location over a short span of one year. He also testified that this is a residential area in which the vehicles speed and that he was aware of several accidents occurring in the area from monitoring his radio. *Tr. 18:18 - 20 and 23 - 25*. Based upon this information, he felt it was a good idea to set up the safety compliance checkpoint.

      **6.**      **On balance, the gravity of the public concerns served by the seizure, and the degree to which the seizure advances the public interest outweighs the severity of the interference with individual liberty**

Speeding vehicles in a residential area is by any measure a hazard and grave public concern because such activity could easily lead to fatalities involving other vehicles and/or pedestrians including innocent bystanders. Speeding at the 17th and D Street intersection was documented by a Lidar radar device and visual observations by trained police officers. Moreover, a number of accidents occurred at the location as monitored by Sgt Evans. These documented problems at 17th and D Streets belies the defendant's argument that "there are no statistics, records, or documentation that this particular location would benefit from having a speeding checkpoint." *See Def. Supp. Memo, p. 10*. Clearly to the contrary, there was a legitimate and recognized interest in "ensuring roadway safety" here that passes muster of the U.S. Supreme Court in the relied upon decisions. See <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543 (1976); <u>Brown v. Texas</u>, 443 U.S. 47, 50- 51 (1979); <u>Delaware v. Prouse</u>, 440 U.S. 648 (1979); <u>Michigan v. Sitz</u>, 496 U.S. 444 (1990); <u>Indianapolis v. Edmond</u>, 121 S. Ct. 447 (2000).

Because the instant checkpoint involved a legitimate District of .Columbia interest which was sufficiently promoted by the checkpoint, and because the checkpoint was minimally intrusive and not a subterfuge for detecting non-traffic crimes, the seizure of defendant at the checkpoint was reasonable under the Fourth Amendment. It therefore follows that the fruits of the lawful arrest of the defendant who was driving without a permit, in violation of the District of Columbia law, should not be suppressed.

WHEREFORE all of the forgoing reasons, the government respectfully request that this Court deny the defendants motion to suppress evidence and statements.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No. 498610

By: _____/s/_____
Angela Hart-Edwards
Assistant United States Attorney
PA Bar #61468
U.S. Attorney's Office
555 4th Street, N.W., Rm. 44241
Washington, D.C. 20530
(202) 307-0031

### Certificate of Service

I hereby certify that a copy of the United States' Supplemental Opposition To Defendant's Supplemental Memorandum in Support of its Motion To Suppress was served electronically upon counsel of record for defendant this 31th day of May, 2007.

_____/s/_____
Angela Hart-Edwards
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNTIED STATES OF AMERICA** | : | |
| | : | |
| v. | : | |
| | : | |
| **LEE OTIS HUDSON** | : | **CRIMINAL NO. 07-082 (ESH)** |
| | : | |
| | : | |
| **Defendant.** | : | |

## ORDER

This matter is before the Court to suppress evidence and statement by defendant. The Court, having considered the Defendant's Motion to Suppress Evidence and Statement, and Supplemental Memorandum of Points and Authorities in Support of the Motion to Suppress, the Government's Opposition and Supplemental Memorandum in Support of its Opposition, and evidence put on at a hearing on May 16, 2007, it is hereby

ORDERED, that the Defendant' Motion to Suppress Evidence and Statement shall be denied.

_____
U.S. District Court Judge E. S. Huvelle