**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

JUN 0 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|                                    |    |                              |
|------------------------------------|----|------------------------------|
| **UNITED STATES OF AMERICA**       | )  |                              |
|                                    | )  |                              |
|                                    | )  |                              |
| v.                                 | )  | **Criminal No.  07-00082 (ESH)** |
|                                    | )  |                              |
|                                    | )  |                              |
| **LEE HUDSON,**                    | )  |                              |
|                                    | )  |                              |
| **Defendant.**                     | )  |                              |
|                                    | )  |                              |

## MEMORANDUM OPINION

At 12:45 a.m. on March 8, 2007, while driving in Northeast Washington, D.C., defendant was stopped at a police roadblock and arrested for driving without a permit.  Upon defendant's arrest, a search of his person uncovered illegal narcotics in a plastic ziplock bag.  Defendant subsequently turned over approximately one hundred additional empty ziplock bags and, in the process, made a potentially incriminating statement.  Pursuant to 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii), a grand jury indicted him for unlawful possession with intent to distribute fifty grams or more of cocaine base.  Defendant has moved to suppress the evidence against him, arguing that his roadblock stop contravened the Fourth Amendment.  The Court held an evidentiary hearing on May 16, 2007.  Based on that hearing and for the reasons set forth herein, defendant's motion will be granted.

### BACKGROUND

At the evidentiary hearing, the government sought to demonstrate the constitutionality of defendant's roadblock stop through the testimony of three officers from the Metropolitan Police Department ("MPD").

## I.     Testimony of Sergeant Evans

The government's first witness was Sergeant Timothy Evans, who has been a sergeant with the MPD for approximately five years. (*See* Hr'g Tr. at 7, May 16, 2007.) Evans is the "supervisor for the [First District's] Street Crime/Power Shift Unit." (*Id.* at 8.) He testified that the purpose of his unit is to do "crime patrol" during the late-night period when other units are changing shifts and conducting roll call. (*Id.* at 27.)

The roadblock at which defendant was stopped was set up by the Street Crime/Power Shift Unit at 11:00 p.m. on March 7, 2007. (*See id.* at 8, 10.) Located at the intersection of 17th and D Streets in Northeast Washington, D.C., the roadblock consisted of four police cruisers parked in a serpentine configuration. (*Id.* at 8, 11.) Although the cruisers flashed their blue and red lights, the roadblock was not otherwise marked by signs or flares. (*Id.* at 13, 34–35.)

"[B]etween 10 and 15" uniformed officers from the Street Crime/Power Shift Unit were responsible for the roadblock's operation. (*Id.* at 11.) Every passing car was stopped. (*Id.* at 15.) Once a car was stopped, an officer would approach the driver, identify himself, announce that he was "conducting a safety and compliance checkpoint," and ask to see the driver's license and registration. (*Id.*) If the driver produced the requested documents, the car was free to go and the stop lasted "[n]o more than a minute." (*Id.*) If the driver could not produce the requested documents, the car would be pulled aside and an officer would use a computer system ("WALES") to check whether the driver was in fact licensed. (*Id.* at 15–16.) If the driver had a license, the car was free to go. (*Id.* at 15.) If not, the driver was arrested. (*Id.* at 21, 34.)

When asked about his personal role at the roadblock, Evans testified that he primarily supervised the line officers but also "g[o]t involved" in checking licenses. (*Id.* at 9.) In addition,

Evans testified that he was responsible for the initial decision to set up the roadblock, and for

selecting the roadblock's time and location. (*See id.* at 18, 25–26.)

Although Evans intimated that the roadblock had other goals as well - - such as ensuring

compliance with seatbelt and insurance laws (*see id.* at 21, 28) - - he unequivocally testified that

the roadblock's primary purpose was to prevent speeding. (*See id.* at 10 ("[W]e have a big

problem with the vehicles flying around the corner at 17th Street at a high rate of speed, which is

really the reason why we set [the roadblock] up there . . . ."); *id.* at 18 ("[There are] a couple of

reasons why we do [the roadblock] that way.  Number one is to slow . . . vehicles down . . . .");

*id.* at 28 ("Q. But specifically, you indicated that the primary purpose of this [roadblock] was to

prevent speeding.  A. Well, it is.  It is.  Yes, ma'am.  In that situation, in this location, yes,

ma'am.  Q. And that's what I'm referring to.  So in this particular one, this was to prevent

speeding.  A. That's correct.").)  Evans believed that there was a speeding problem at the location

of the roadblock based on his personal observations monitoring traffic there.  (*Id.* at 18.)

Although he also testified, without providing any time frame, that "there ha[d] been [radar] used

at that location," and that the radar had "documented" a speeding problem, no documentation or

further specifics were proffered to substantiate this testimony.  (*Id.*)  Evans conceded that, at least

as of March 2007, he was unaware of any injuries to pedestrians or car accidents in the vicinity of

the roadblock.[1]  (*See id.* at 33.)

---

[1]Although the government argues that Evans knew of "several accidents" from
"[m]onitoring [his] radio" (United States' Supp. Mem. in Support of Its Opp. to Def.'s Mot. to
Suppress Evid. ["USA Supp."] at 7 (quoting Hr'g Tr. at 33)), Evans made clear that he could not
say when those accidents occurred, and that he was unaware of any accidents prior to the date of
the roadblock at which defendant was stopped. (*See* Hr'g Tr. at 33 ("The Court: But prior to the
8th, were you aware of actual automobile accidents, whether or not a pedestrian was struck . . . ?
The Witness: Oh, no, ma'am, I was not.  I wasn't - - I mean, I've known there's been accidents

Evans further testified that he had no directive from his superiors that either required him to conduct roadblocks or gave him guidance about when or where to do so. (*See id.* at 43; *see also id.* at 24 (explaining that, on March 8, 2007, there were no "written policies regulating" roadblocks conducted by the Street Crime/Power Shift Unit).) Such decisions were left entirely to his discretion. (*See id.* at 25–26; *see also id.* at 44–45 (explaining that his unit did not conduct roadblocks at the intersection of 17th and D Streets until Evans selected the location upon his promotion to sergeant).)

Similarly, at least as of March 8, 2007, there were no MPD regulations, directives, or orders governing the conduct of roadblocks.[2] (*See id.* at 11–12, 43.) Although Evans testified that he provides oral instructions to his officers about how to conduct roadblocks, they receive no written orders. (*Id.* at 43.)

Finally, Evans testified that there is no documentation regarding the effectiveness of the roadblock at which defendant was stopped. (*See id.* at 22 (explaining that he did not fill out any paperwork related to the roadblock and that, to his knowledge, there was no paperwork to be filled out).) Moreover, although Evans testified that his unit had conducted roadblocks at the intersection of 17th and D Streets ten times over the prior two years (*id.* at 10) - - "especially during the crime initiative of last summer" (*id.* at 44) - - the government produced no documentation relating to the results of those roadblocks.

When asked about the effectiveness of the roadblock at which defendant was stopped,

_____

on that road, several accidents . . . . There's been several accidents. I couldn't tell you when, though.").)

[2]According to Evans, an order relating to roadblocks has recently been issued, but it "hasn't been finished yet" and was not in place on March 8, 2007. (Hr'g Tr. at 12.)

4

Evans replied in general terms that conducting roadblocks often enables him to remind people to wear their seatbelts. (*Id.* at 21 ("[D]uring the course of checkpoints, I've probably told 20 people to put on their seatbelts . . . .").) In addition, Evans recalled that, on the night in question, "about 50 to 60" cars were stopped, yielding five arrests, five citations, and one warning. (*Id.* at 14, 16, 31–32.) Of the five arrests, three were for possession of an open container of alcohol and two (including defendant's) were for driving without a permit. (*Id.* at 33.) The citations were "[t]raffic-related," including citations "for no permit and for [window] tint violation," and the warning was for a tint violation. (*Id.* at 14.) According to Evans, such results were typical of roadblocks conducted at the intersection of 17th and D Streets. (*See id.* at 32.) There was, however, no evidence proffered (whether relating to the roadblock at issue here or to any prior roadblock) to indicate that any speeding tickets or speed-related warnings were issued or that radar was ever used in conjunction with a roadblock.

## II.   Testimony of Officer Nesmith

The government's second witness was Officer Terrance Nesmith, the officer who arrested defendant. (*See, e.g., id.* at 52 (describing the arrest).) Nesmith has been employed with the MPD for just over two years. (*Id.* at 58.) He recalled having participated in roadblocks six times during that period. (*Id.*) Specifically, he recalled having conducted roadblocks at the intersection of 17th and D Streets on one or two occasions prior to the night that defendant was stopped. (*Id.* at 58–59.)

Nesmith has never attended any formal meetings regarding how to conduct a roadblock. (*See id.* at 61.) He testified that, at roll call, supervising officers will "sometimes" give instructions about what to look for at a roadblock, but sometimes not. (*Id.*) He further

explained: "[I]t [is] just a known thing that when we do the safety compliance checkpoints, we look for license, registration, insurance, and any obvious safety violations on the vehicle." (*Id.*)

More specifically, Nesmith testified that, on the occasion of defendant's arrest, there was no formal briefing about how to conduct the roadblock. (*See id.*) Rather, at the direction of Evans, Nesmith reported directly to the roadblock. (*Id.* at 48, 60–61.)

When Nesmith arrived at the roadblock, he parked his car a few feet away from the four parked police cruisers and walked beyond them to defendant's car, which was "the next car that wasn't stopped." (*Id.* at 50; *see id.* at 48–50.) After pulling defendant over, Nesmith explained that he was conducting a "safety compliance checkpoint" and asked for defendant's "[l]icense, registration, [and] insurance card." (*Id.*) Defendant stated that he did not have a license. (*Id.* at 50.) In response, Nesmith asked: "[D]o you not have a license, or you left it at home?" (*Id.*) When defendant replied that he did not have a license at all, Nesmith "stepped him out" of the car. (*Id.*) Nesmith then asked again whether defendant had a license, and defendant again replied that he did not. (*Id.* at 51.) Accordingly, Nesmith gave defendant's name to another officer for a WALES check. (*See id.* at 51, 63.) When it was confirmed that defendant did not have a license, Nesmith "put . . . handcuffs on him and . . . advised him [that] he was arrested for a no permit." (*Id.* at 52.) Nesmith then searched defendant's person and found a ziplock bag of narcotics hanging from behind defendant's belt. (*Id.*)

## III.   Testimony of Officer Zurowski

The government's final witness was Officer Thomas Zurowski, who transported defendant from the scene of his arrest to the First District's police station for processing. (*See id.* at 70.) Upon arriving at the station, Zurowski opened the rear door of the transport vehicle and

defendant handed him a large ziplock bag containing approximately one hundred smaller, empty ziplock bags. (*Id.* at 71, 72.)  As defendant handed over the bags, he asked Zurowski: "Can you get rid of these since I gave it to you?" (*Id.* at 71.)

Zurowski testified that he has been with the First District for five years. (*Id.* at 70.)  He recalled participating in roadblocks at the intersection of 17th and D Streets on one or two occasions prior to March 2007. (*Id.* at 78.)  On no occasion, however, had he received instruction on what to look for or ask at a roadblock. (*Id.*)

It was Zurowski's understanding that roadblocks were conducted at the intersection of 17th and D Streets because of a speeding problem there. (*See id.* at 78–79.)  Although asserting first-hand knowledge of the speeding problem, Zurowski conceded that, in approximately two years of patrolling the relevant area, he had never "heard of or observed an accident" there. (*Id.* at 79–80.)

## ANALYSIS

### I.   Legal Framework

"The Supreme Court has derived a principle from the Fourth Amendment: a search or seizure of a person must be based on individualized suspicion of wrongdoing." *United States v. Davis*, 270 F.3d 977, 979 (D.C. Cir. 2001).  It is well settled that stopping a vehicle at a roadblock constitutes a Fourth Amendment "seizure." *See, e.g.*, *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990) ("Petitioners concede, correctly in our view, that a Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint.").  However, the Supreme Court has held that, under certain circumstances, roadblock seizures are exempt from the requirement of individualized suspicion. *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S.

32, 37–40 (2000) (summarizing the Court's jurisprudence on suspicionless roadblock stops).  It

is the government's burden to persuade the Court that the circumstances of this case justify such

an exemption.  *See Davis*, 270 F.3d at 982.

 As the Supreme Court established in *Edmond*, there can be no exception to the

individualized suspicion requirement for stops at a roadblock "whose primary purpose is

ultimately indistinguishable from the general interest in crime control."  531 U.S. at 44.  For

example, if a roadblock's primary purpose is the "discovery and interdiction of illegal narcotics,"

a roadblock stop will be found unreasonable absent individualized suspicion.  *Id.* at 34; *see, e.g.,*

*id.* at 44 ("We decline to suspend the usual requirement of individualized suspicion where the

police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes.

We cannot sanction stops justified only by the generalized and ever-present possibility that

interrogation and inspection may reveal that any given motorist has committed some crime.").

At such a roadblock, individualized suspicion is required even if, in addition to the *primary*

purpose of detecting or preventing crime, the roadblock has other, legitimate purposes.  *See, e.g.,*

*id.* at 46 ("Petitioners argue that the Indianapolis checkpoint program is justified by its lawful

secondary purposes of keeping impaired motorists off the road and verifying licenses and

registrations.  If this were the case, however, law enforcement authorities would be able to

establish checkpoints for virtually any purpose so long as they also included a license or sobriety

check." (citation omitted)).

 When a roadblock's primary purpose is something other than mere crime control,

suspicionless stops at the roadblock may be - - but are not "automatically, or even

presumptively" - - constitutional.  *Illinois v. Lidster*, 540 U.S. 419, 426 (2004).  When seizures at

8

such roadblocks are challenged, courts "must judge [the seizures'] reasonableness, hence, [their]

constitutionality, on the basis of the individual circumstances." *Id.* More specifically, the

reasonableness of such seizures is assessed under the three-part balancing test of *Brown v. Texas*,

443 U.S. 47 (1971). *See, e.g., Sitz*, 496 U.S. at 449–50 (endorsing the use of the *Brown* test).

The first consideration is "the gravity of the public concerns served by the seizure;" the second

consideration is "the degree to which the seizure advances the public interest;" and the third,

countervailing consideration is "the severity of the interference with individual liberty." *Brown*,

443 U.S. at 51.

## II.     Primary Purpose of the Roadblock

The government initially characterized the primary purpose of the roadblock here as the

prevention of speeding. (*See* Opp. at 2 (explaining that the roadblock was designed, "in

particular, to address [a] speeding problem in the area").) Witness testimony at the evidentiary

hearing was consistent with the government's characterization. (*See, e.g.*, Hr'g Tr. at 18 ("[There

are] a couple of reasons why we do [the roadblock] that way. Number one is to slow . . . vehicles

down . . . ."); *id.* at 28 ("Q. But specifically, you indicated that the primary purpose of this

[roadblock] was to prevent speeding. A. Well, it is. It is. Yes, ma'am. In that situation, in this

location, yes, ma'am. Q. And that's what I'm referring to. So in this particular one, this was to

prevent speeding. A. That's correct.").)

In its most recent pleading, however, the government has retreated from its original

position and attempted to recast the roadblock's primary purpose to encompass "not only

speeding, . . . but also safety compliance" more generally. (USA Supp. at 4.) In light of the

government's evidence, its attempt cannot succeed, for, if anything, safety compliance was a

9

secondary purpose only. (*See* Hr'g Tr. at 21 ("Well, [trying to stop speeding is] part of it, *but also*, obviously, I don't know how many times I've told people to put their seat belts on . . . ." (emphasis added)); *id.* at 28 (explaining that "mak[ing] sure people are knowledgeable" and "mak[ing] sure people have the proper paperwork with their vehicle" are among the general goals of Street Crime/Power Shift Unit roadblocks, but that the primary goal of the *particular* roadblock at which defendant was stopped was the prevention of speeding).) Accordingly, the government cannot shift gears to salvage defendant's stop by arguing that the roadblock served the general interest of promoting compliance with traffic-safety regulations. *See, e.g.*, *Edmond*, 531 U.S. at 46 ("Petitioners argue that the Indianapolis checkpoint program is justified by its lawful secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations. If this were the case, however, law enforcement authorities would be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check." (citation omitted)).

As the parties agree, assuming that the primary purpose of the roadblock was to prevent speeding, the reasonableness of defendant's suspicionless stop must be judged by assessing the individual circumstances of this case under the *Brown* balancing test. (*See* USA Supp. at 4; Supp. Mem. of Points and Authorities in Support of Mot. to Suppress Tangible Evid. ["Def.'s Supp."] at 8.) Speed prevention is an interest readily distinguishable "from the general interest in crime control." *Edmond*, 531 U.S. at 44. Like the prevention of drunk driving and the verification of drivers' licenses and vehicle registrations - - purposes which the Supreme Court has indicated can justify suspicionless roadblock stops - - the prevention of speeding may be characterized as an interest in promoting highway safety. *See Sitz*, 496 U.S. at 455 (upholding a

checkpoint program designed to prevent drunk driving); *Delaware v. Prouse*, 440 U.S. 648, 658 (1979) (approving, in dicta, the use of properly tailored checkpoints to promote highway safety by checking licenses and registration). Accordingly, if preventing speeding were the primary purpose of the roadblock at which defendant was stopped, *Edmond*'s "presumptive rule of unconstitutionality [would] not apply here." *Lidster*, 540 U.S. at 426.

Whether the evidence here is sufficient to support a finding that the roadblock's primary purpose was to prevent speeding presents an "exceedingly close question." *Davis*, 270 F.3d at 981. As *Edmond* makes clear, to determine a roadblock's primary purpose, courts must consider evidence at "the programmatic level." 531 U.S. at 48. Here, the roadblock was established not as part of any program or citywide (or even neighborhood) initiative, as was the case in *Davis*, *see* 270 F.3d at 981, but because of a single officer's belief that there was a speeding problem at a particular location in Northeast. (*See* Hr'g Tr. at 24–26, 43–45.) To the extent that the record contains any evidence of a "programmatic purpose," *Edmond*, 531 U.S. at 46, it suggests that the roadblock's primary purpose was not to prevent speeding, but to control crime. (*See* Hr'g Tr. at 44 (stating that, in the past, similar roadblocks at the same location have been conducted as part of a "crime initiative").) Similarly, much of the evidence that the Court is required to consider regarding the "specific circumstances" of this roadblock, *Davis*, 270 F.3d at 982, also points to crime control as the roadblock's primary purpose. (*See, e.g.*, Hr'g Tr. at 8, 10 (explaining that the roadblock was conducted in the middle of the night); *id.* at 27 (explaining that the primary purpose of the MPD unit that conducted the roadblock was "crime patrol").) Moreover, as defendant has argued, the claim that police would employ a roadblock to control speeding seems dubious given the availability of many far better tools for accomplishing that purpose. (*See*

11

Def.'s Supp. at 8–9 (observing that the police can address speeding by using radars, signs, and conducting traffic stops based on individualized suspicion).)

Ultimately, however, it is not necessary for the Court to decide whether speed prevention was a "subterfuge" for crime prevention. *United States v. McFayden*, 865 F.2d 1306, 1312 (D.C. Cir. 1989), *abrogated in part by Davis*, 270 F.3d at 981. For even accepting the assertion that the roadblock's primary purpose was to prevent speeding, the government has not met its burden of demonstrating that defendant's suspicionless stop was reasonable under *Brown*'s three-part balancing test.

## III. *Brown*'s Balancing Test

### A. Gravity of the Public Concern

The government's first task in establishing the reasonableness of defendant's seizure is to demonstrate the "gravity" of the speeding problem that the roadblock was assertedly designed to address. One way of doing so would be to cite anecdotal or statistical evidence of the problem. *See Sitz*, 496 U.S. at 451. For example, the *Sitz* Court concluded that "[n]o one can seriously dispute the magnitude of the [nation's] drunken driving problem" based on a "legion" of "[m]edia reports of alcohol-related death and mutilation on the Nation's roads," and on statistical evidence that drunk drivers cause over five billion dollars in property damage, one million personal injuries, and twenty-five thousand deaths annually. *Id.* Similarly, the Court in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), characterized the entry of illegal aliens from Mexico as posing "formidable law enforcement problems," *id.* at 552, based partly on statistical evidence that 85 percent of the nation's ten to twelve million illegal aliens were from Mexico. *See id.* at 551.

Here, however, the government has presented *no* statistical evidence of a speeding problem at the location of the roadblock.  Despite testimony about the MPD's use of radar there (Hr'g Tr. at 18), the record contains not a shred of evidence regarding any radar results or even the issuance of any citations for speeding.  Significantly, there is also no claim that radar was used on the night that defendant was stopped.

The anecdotal evidence from Evans and Zurowski, who testified that they had first-hand knowledge of a speeding problem near the roadblock (*see id.* at 18, 79), does little to alleviate this gap, because their testimony fails to demonstrate that the speeding problem, if one existed, was particularly grave.  Both officers testified that, at least as of March 2007, they were unaware of any accidents in the vicinity of the roadblock.  (*See id.* at 33, 79.)  The record is also devoid of community complaints about speeding in the area, in contrast to *Davis*, where "[c]ommunity groups and church 'activists' complained about 'speeding, children were unable to play on the sidewalk, parents actually had their children playing inside the yard because they were afraid a car might go out of control or their kids might get hit or something.'" 270 F.3d at 981 (quoting testimony from the district court's evidentiary hearing)).

Absent statistical or persuasive anecdotal evidence of a grave speeding problem, the government might alternatively succeed in demonstrating "the gravity of the public concern[] served by [defendant's] seizure" by establishing the difficulty of preventing speeding absent a roadblock.  *Brown*, 443 U.S. at 51.  For example, in *Martinez-Fuerte*, the Court characterized the government interest in conducting stops at permanent immigration checkpoints as "great" because "the flow of traffic [from the Mexican border] tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of

illegal aliens." 428 U.S. at 557. Here, as defendant correctly emphasizes, speeding is a readily observable problem that can be effectively controlled by means other than a roadblock. (*See* Def.'s Supp. at 8–9.) Thus, even assuming *arguendo* that the primary purpose of the roadblock was to prevent speeding, *Brown*'s "gravity" factor fails to support the reasonableness of defendant's stop.

### B.      Degree to Which the Roadblock Advanced the Public Interest

To demonstrate the reasonableness of defendant's stop, the government must also show that the roadblock "advance[d] the public interest" in preventing speeding. *Brown*, 443 U.S. at 51. The government is not required to show that the roadblock was the most effective means of advancing that interest. *See, e.g.*, *Sitz*, 496 U.S. at 453 (explaining that the Fourth Amendment permits governmental officials to choose "among reasonable alternative law enforcement techniques"). However, the government cannot satisfy its burden of demonstrating that the roadblock reasonably advanced its primary goal of preventing speeding by arguing that the roadblock was a productive means of advancing some other, secondary goal such as ensuring safety compliance more generally. *See, e.g.*, *McFayden*, 865 F.2d at 1313 ("These percentages reflect a higher rate of apprehension than found in *Martinez-Fuerte* and demonstrate the effectiveness of the roadblocks *for the stated purpose*." (emphasis added)); *Taylor v. United States*, 595 A.2d 1007, 1008–09 & 1008 n.1 (D.C. 1991) (explaining that, although the defendant's roadblock stop might have been constitutional if the roadblock had been designed primarily to check licenses and registrations, suppression of the evidence was warranted because the roadblock did not plausibly advance its *actual* primary purpose of reducing traffic congestion).

14

In many roadblock cases, the government provides empirical evidence of the roadblock's productiveness. *See, e.g.*, *Sitz*, 496 U.S. at 454–55 (discussing relevant statistical data). Such empirical evidence may relate either to the results of the particular roadblock at issue or to the results of other, comparable roadblocks. *See, e.g.*, *id.* (considering both types of data). Moreover, even when the data indicate that a roadblock had a very low rate of success, the roadblock can be said to advance the government's interest. In *Sitz*, for example, the second *Brown* factor favored the government when the data suggested that the checkpoint in question had a success rate of 1.6 percent, and that comparable checkpoints elsewhere had an average success rate of 1 percent. *See id.* at 455. Similarly, in *Martinez-Fuerte*, one of the checkpoints approved by the Court had a "ratio of illegal aliens detected to vehicles stopped . . . [of] approximately 0.5 percent." *Id.* (citing *Martinez-Fuerte*, 428 U.S. at 554).

Despite the elasticity of this factor, the government failed to elicit any relevant evidence. The record is devoid of any documentation about the roadblock at which defendant was stopped (*see* Hr'g Tr. at 22), or about any prior speeding roadblock conducted at this location or any other location in the city. (*See id.* at 10.) *Cf. Fraternal Order of Police/Dep't of Corr. Labor Comm. v. Washington*, 394 F. Supp. 2d 7, 13 (D.D.C. 2005) ("This was the first time that [the Department of Corrections had] established such a checkpoint. Therefore, there was no history to provide empirical evidence of past successes.").

To the extent that there is any relevant evidence, it suggests that the roadblock had no success in preventing speeding. Evans's testimony reveals that, although between fifty and sixty vehicles were stopped on the night that defendant was arrested, *not one* of the resulting warnings, citations, or arrests was based on speeding. (*See* Hr'g Tr. at 14, 33.) Furthermore, Evans

15

testified that the results of the roadblock here were typical of other roadblocks that he has

conducted at the same location. (*See id.* at 32.) Although the roadblock did produce some

traffic-related citations and arrests, including defendant's (*see id.* at 33), such results do not

demonstrate that the roadblock advanced the purpose of preventing speeding. *See Taylor*, 595

A.2d at 1008–09 & 1008 n.1 (illustrating that a roadblock's constitutionality depends on whether

its *primary* purpose, not its secondary purpose, is advanced to a sufficient degree); *see also*

*Edmond*, 531 U.S. at 39 (observing that, in *Sitz*, "there was an obvious connection between the

imperative of highway safety and the law enforcement practice at issue").[3]

Even without empirical evidence that the roadblock helped to prevent speeding, the

second *Brown* factor could be satisfied if there were evidence that the roadblock conformed to

reasonable guidelines prescribed in advance by policymakers. *See, e.g., Martinez-Fuerte*, 428

------

[3]The D.C. Circuit has observed, in dicta, that "any roadblock" would "doubtless" stop speeding. *Davis*, 270 F.3d at 981. Although this intuitive observation might theoretically invite an argument that any roadblock established for the primary purpose of preventing speeding necessarily satisfies the government's burden under the second factor of the *Brown* test, the government has not made this argument here, but has instead argued that the roadblock produced relevant warnings, citations, and arrests. (*See* USA Supp. at 5 (highlighting Evans's testimony regarding the number of general traffic-safety warnings, citations, and arrests that resulted from the checkpoint here and other similar checkpoints); Opp. at 7 ("[T]he government expects the record to indicate that there is a reduction in speeding and other traffic violations as a result of a checkpoint, and that a number of arrests occurred that evening rendering the checkpoint sufficiently productive.").)

In any event, by raising such an argument, the government would only have invited further skepticism as to the roadblock's true purpose. (*See* Def.'s Supp. at 9 ("Because it is impossible to cite someone for speeding when his or her car is not moving, using speeding as a basis for a checkpoint invites - - indeed requires - - the conclusion that it is only a pretext for discovering other violations.").)  Such an argument would also have prompted a question as to whether there was any valid basis for officers to check motorists' licenses and registrations after having already succeeded in stopping their vehicles. *See, e.g., United States v. Huguenin*, 154 F.3d 547, 560 (6th Cir. 1998) (holding a roadblock objectively intrusive because "defendants were subjected to questioning involving more than a few brief queries necessary to effectuate the alleged purpose of the checkpoint").

U.S. at 562 n.15 ("We think the decision to locate a checkpoint at San Clemente was reasonable.

The location meets the criteria prescribed by the Border Patrol to assure effectiveness . . . ."); *see*

*also id.* at 553 (listing the factors that "[t]he Border Patrol believe[d] . . . [would] assure

effectiveness," and that determined the selection of checkpoint locations); *cf. Prouse*, 440 U.S. at

659 ("The question remains . . . whether in the service of these important ends the *discretionary*

spot check is a sufficiently productive mechanism to justify the intrusion upon Fourth

Amendment interests which such stops entail. . . . Absent some empirical data to the contrary, it

must be assumed that finding an unlicensed driver among those who commit traffic violations is

a much more likely event than finding an unlicensed driver by choosing *randomly* from the entire

universe of drivers." (emphasis added)).

　　　　Here, however, there were no preestablished guidelines governing either the conduct of

the roadblock or its location and timing.  (*See* Hr'g Tr. at 11–12, 24–26, 43.)  Evans - - who was

not a policymaker, but an officer who worked in the field both supervising and conducting

roadblock stops (*see id.* at 9) - - made an entirely discretionary decision to set up the roadblock

when and where he did.  (*See id.* at 18, 24–26, 43–45.)  In addition, the evidence suggests that the

line officers at the roadblock did not receive any formal training or instructions about how to

conduct their stops.  (*See id.* at 61 (Nesmith never attended any formal meetings about how to

conduct a roadblock and that, on the occasion at issue here, he did not receive any formal

briefing); *id.* at 78 (Zurowski never received any instruction on what to look for or ask at a

roadblock, despite working in the First District for five years and conducting multiple

roadblocks).  *But see id.* at 43 (suggesting that Evans generally gives his officers oral instructions

about how to conduct roadblocks, although they receive no written orders).)  Accordingly, the

17

facts do not permit the Court to infer that policymakers have determined that roadblocks such as the one at issue here will advance the public interest in preventing speeding.

### C.    Intrusiveness of the Roadblock

In addition to considering whether the gravity of the alleged speeding problem and the roadblock's success in combating that problem justified the stop of defendant's vehicle, the Court must also consider *Brown*'s third factor - - the extent of the roadblock's intrusion upon defendant's individual liberty.

As defined by the Supreme Court, a roadblock's "objective" intrusiveness is "measured by the duration of the seizure[s] and the intensity of the investigation" taking place there. *Sitz*, 496 U.S. at 452.  At the roadblock here, most stops lasted "[n]o more than a minute." (Hr'g Tr. at 15.)  The investigation, while more than "minimal,"[4] was arguably not particularly burdensome: motorists were asked to show a license and registration, but then they were free to go.[5]  (*Id.*)  *Cf. Lidster*, 540 U.S. at 427 (upholding a roadblock at which "each stop required . . . a . . . wait in line [of] a very few minutes at most," "[c]ontact with the police lasted only a few seconds," and investigation was limited to asking questions about an unsolved hit-and-run accident); *Sitz*, 496 U.S. at 445 (upholding a roadblock program under which motorists were observed for signs of insobriety and stops lasted an average of twenty-five seconds); *Martinez-Fuerte*, 428 U.S. at 546–47 (observing that, at one of the roadblocks upheld, some motorists were

---

[4]In *Sitz*, the Court characterized as "minimal" the objective intrusiveness of a roadblock program pursuant to which which motorists would be briefly observed for signs of insobriety, but not required to show their licenses or registrations.  496 U.S. at 452; *see also Martinez-Fuerte*, 428 U.S. at 546 ("Most motorists are allowed to resume their progress without any oral inquiry or close visual examination.").

[5]*See supra* note 3.

directed to a "secondary inspection area" where they were detained for an average of "three to five minutes" and "asked about their citizenship and immigration status").

However, the reasonableness of defendant's stop also depends upon the roadblock's "subjective" intrusiveness. *Sitz*, 496 U.S. at 452.  One measure of subjective intrusiveness is whether a roadblock, by its nature, threatens to engender "fear and surprise" in law-abiding motorists. *Id.*  Among other factors, the likelihood of frightening or surprising motorists depends on the roadblock's timing and location, whether it is manned by uniformed law enforcement officers, and whether it is well marked. *See, e.g., id.* at 453 (stating that stopping motorists "at night on seldom-traveled roads . . . may frighten [them]," but that "visible signs of the officers' authority" (such as uniforms) lessen the risk of fear and surprise (quoting *United States v. Ortiz*, 422 U.S. 891, 894–95 (1975))); *McFayden*, 865 F.2d at 1313 (finding that "the operation of the roadblock observed the Fourth Amendment standard of minimal interference with individual liberty" in part because "[t]he roadblock was marked by flares, and a police car and uniformed police officers [were] standing by").  A second measure of a roadblock's subjective intrusiveness - - closely related to the consideration of "fear and surprise" and perhaps more significant - - is the degree of restraint placed upon the discretion of officers in the field. *See, e.g., id.* (emphasizing with approval the roadblock program's many constraints on an officer's exercise of discretion).

When addressing the importance of limiting officer discretion, whether in roadblock cases or other Fourth Amendment contexts, the Supreme Court has stressed the need for preexisting guidelines to govern officer conduct.  In *Brown*, for example, the Court stated a bright-line rule that any seizure not based on individualized suspicion "must be carried out

19

pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers."

443 U.S. at 51. Consistent with the rule of *Brown*, the Court has held that "reasonable police

regulations relating to inventory procedures administered in good faith satisfy the Fourth

Amendment." *Colorado v. Bertine*, 479 U.S. 367, 374 (1987). Similarly, in *Sitz*, the Court held

that the subjective intrusion imposed upon motorists by Michigan's sobriety checkpoints was

reasonable because the "checkpoints [were] selected pursuant to . . . guidelines," and the

guidelines required "officers [to] stop every approaching vehicle." 496 U.S. at 453; *see also id.*

at 447 (describing the guidelines). In *Prouse*, the Court observed that its prohibition against

suspicionless stops by roving patrols did not preclude state governments "from developing

*methods* for spot checks that [would] involve less intrusion or that [would] not involve the

unconstrained exercise of discretion." 440 U.S. at 663 (emphasis added).[6] And the *Martinez-*

*Fuerte* Court, having previously emphasized that the locations of immigration checkpoints were

determined according to a preset list of criteria, observed that such checkpoints did not promote

"unreviewable discretion," in part because the locations of such checkpoints were chosen "by

officials responsible for making overall decisions as to the most effective allocation of limited

resources," who "[would] be unlikely to locate a checkpoint where it [would] bear[] arbitrarily or

oppressively on motorists as a class." 428 U.S. at 559; *see also Edmond*, 531 U.S. at 56

(Thomas, J., dissenting) (interpreting *Sitz* and *Martinez-Fuerte*, "[t]aken together, . . . [to] stand

for the proposition that suspicionless roadblock seizures are constitutionally permissible if

conducted according to a plan that limits the discretion of the officers conducting the stops").

_____

[6]As the Court observed in *Edmond*, "[t]he officer's conduct in [*Prouse*] was
unconstitutional primarily on account of his exercise of 'standardless and unconstrained
discretion.'" *Edmond*, 531 U.S. at 39 (quoting *Prouse*, 440 U.S. at 661).

Consistent with this Supreme Court precedent, a host of lower courts have held that a suspicionless stop at a roadblock is unreasonable unless the timing and location of the roadblock, and the procedures for stopping motorists there, are governed by preset guidelines. *See, e.g.,* *Huguenin*, 154 F.3d at 560–63 (relying on *Sitz, Martinez-Fuerte,* and *Brown* to invalidate a checkpoint for which there were no preestablished guidelines regarding timing, location, or procedures); *State ex rel. Ekstrom v. Justice Court*, 663 P.2d 992, 996 (Ariz. 1983) (invalidating "roadblocks . . . set up at the discretion of a local highway patrolman . . . and operated without specific directions or guidelines"); *Commonwealth v. Anderson*, 547 N.E.2d 1134, 1136 (Mass. 1989) ("In order to assure that a roadblock seizure of a citizen without even individualized suspicion is 'reasonable' under the Fourth Amendment . . . , . . . the roadblock [must] meet standard, neutral guidelines, and be conducted pursuant to a plan devised in advance by law enforcement supervisory personnel."); *State v. Crom*, 383 N.W.2d 461, 463 (Neb. 1986) ("The uncontradicted evidence in the case before us is that there was no plan formulated at the policymaking level of the Omaha Police Department, or elsewhere, which considered, weighted, and balanced the factors enumerated in [*Prouse*] and *Brown*. Rather, a six- or seven-person unit within the department, commanded by a field sergeant, was left free to decide when, where, and how to establish and operate the transitory checkpoint in question. The checkpoint was thus subject to the constitutional infirmity found to exist in both [*Prouse*] and *Brown*; that is, a driver's reasonable expectation of privacy was rendered subject to arbitrary invasion solely at the unfettered discretion of officers in the field."); *People v. Carter*, 807 N.Y.S.2d 274, 279 (N.Y. Dist. Ct. 2005) (holding that, although roadblocks must be conducted in accordance with a preexisting plan, written guidelines are not required). The Supreme Court of Florida has gone

21

even further, holding that the Fourth Amendment requires *written* guidelines governing the

procedures that field officers at a roadblock must follow. *See, e.g., State v. Jones,* 483 So.2d

433, 438 (Fla. 1986) ("We . . . find that it is essential that a written set of uniform guidelines be

issued before a roadblock can be utilized."); *see also Hagood v. Town of Town Creek,* 628 So.2d

1057, 1061 (Ala. Crim. App. 1993) (holding a roadblock stop unreasonable in part because

"there was no written policy concerning any aspect of the roadblock").

     Neither the D.C. Circuit nor this Court has previously addressed whether, absent any form

of preestablished guidelines, suspicionless stops at roadblocks may nonetheless be reasonable.

However, it is clear from *McFayden* that the D.C. Circuit regards the existence of such

guidelines as highly significant:

> Finally, the roadblock was "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers," *Brown v. Texas,* 443 U.S. at 51, . . . and did not vest "standardless and unconstrained discretion," *Prouse,* 440 U.S. at 661, . . . in the officers operating the checkpoint. The initial decision to use roadblocks was made by Assistant Chief Fulwood. . . . He explained that the "traffic problem had become so severe" in the Sixth District that "we requested the Department of Public Works to put up no parking signs." . . . A list of possible roadblocks was determined in advance by the District Commander on the basis of community complaints. The 58th Street roadblock was included in this list. Roadblocks were supervised by nonfield officials. The field officers were specifically instructed to check licenses and registrations of all the cars passing in either direction, and they did so in a systematic and preplanned fashion. The police had no discretion to engage in random or roving stops.

865 F.2d at 1313 (record citations omitted).

     The present case stands in stark contrast to *McFayden.* Whereas in *McFayden* the initial

decision to use roadblocks was made by the MPD's assistant chief, the decision here was

made, without guidance from any departmental directive, by an officer in the field who both

supervised the roadblock and participated in stopping motorists. (*See* Hr'g Tr. at 9, 43.) In

choosing a location for the roadblock, Evans relied not on a preestablished list of possible

locations compiled with reference to community complaints, but on his own personal

determination that the location was a desirable one. (*See id.* at 25–26, 44–45.) Also, unlike the

line officers in *McFayden*, the officers conducting the roadblock here testified that they received

no instructions regarding proper operating procedures. (*See id.* at 61, 78.)

In the face of this evidence of unbridled discretion in both the establishment and

operation of the roadblock, the government contends that the roadblock was minimally intrusive

because it bore other indicia of reasonableness. For example, the government emphasizes that

the roadblock was comprised of four marked police cruisers, that the police cruisers had their

overhead lights on, and that the officers conducting the roadblock wore uniforms. (*See* USA

Supp. at 6.) The government also points to the fact that "all vehicles that approached or passed

through the checkpoint were stopped, and all drivers were asked . . . [for a] driving permit and

registration." (*Id.* at 7.)

However, it is not sufficient that the roadblock may have, by happenstance, been

conducted in a systematic and nondiscriminatory fashion. As the Supreme Court has explained

in a related context, a roadblock may be unconstitutional even if it bears outward signs of

legality. *See Edmond*, 531 U.S. at 47 ("[A checkpoint] program driven by an impermissible

purpose may be proscribed while a program impelled by licit purposes is permitted, even though

the challenged conduct may be outwardly similar."). Here, although the record indicates that

every vehicle passing through the roadblock was stopped, there is no evidence that the officers

were *constrained* to stop every vehicle by preestablished procedures. (*See* Hr'g Tr. at 61, 78.)

Rather, the evidence suggests that, when the officers requested a license and registration from

every passing driver, they did so based on informal custom, not departmental policy. (*See id.* at 61 ("[I]t [is] *just a known thing* that when we do the safety compliance checkpoints, we look for license, registration, insurance, and any obvious safety violations on the vehicle." (emphasis added)).) A custom regarding procedures for carrying out a roadblock is not an adequate substitute for formal, preestablished guidelines on how to do so, nor can it cure a total lack of guidelines regarding if, when, and where a roadblock may be conducted in the first place. *See, e.g.*, *Martinez-Fuerte*, 428 U.S. at 559 (observing that immigration checkpoints "both appear to *and actually* involve less discretionary enforcement activity" than roving patrols (emphasis added)); *see also* Wayne R. LaFave, *Controlling Discretion by Administrative Regulations: The Use, Misuse, and Nonuse of Police Rules and Policies in Fourth Amendment Adjudication*, 89 Mich. L. Rev. 442, 513 (1990) (describing the notion of substituting custom for policy as "unsettling for two reasons: (1) there is always the risk that [police officers'] testimony [about standard procedures] will be self-serving and thus fail to represent accurately what the usual practice is; and (ii) even if it is the usual practice, it does not follow that it is the considered policy of the department").

Given the evidence of "standardless and unconstrained discretion" with respect to the roadblock in this case, *Prouse*, 440 U.S. at 661, the third *Brown* factor weighs decidedly in defendant's favor. For even if the roadblock's objective intrusiveness might be characterized as insubstantial, the objective factors here are far outweighed by the roadblock's substantial subjective intrusiveness.

## CONCLUSION

Having considered the reasonableness of defendant's roadblock stop under *Brown*'s

three-part test, the Court concludes that the balance tips in defendant's favor.  Indeed, the

government has failed to meet its burden with respect to any of the relevant factors.  There is

little evidence that speeding at the location of this roadblock was a matter of grave concern; there

is no evidence to demonstrate that the roadblock addressed the primary purpose asserted; and,

given the "standardless and unconstrained discretion" exercised by the police, *id.*, the intrusion

upon individual liberty exceeded the boundaries of reasonableness.  Under these circumstances,

the Court concludes that the drugs, plastic bags, and statement obtained from defendant through

the roadblock are "fruit of the poisonous tree," and his motion to suppress that evidence will be

granted.

ELLEN SEGAL HUVELLE
United States District Judge

Date:   June 5, 2007